IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| SHARON TYSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 11-3543-CV-S-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying her application for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in October 1976 and has prior work experience as a fast food manager, cook, sales clerk, order clerk, and hand packager. She alleges she became disabled on September 21, 2008, due to the combined effects of Type I diabetes and related neuropathy.

The Record includes reports from before Plaintiff's alleged onset date, and they reflect Plaintiff historically did not take steps necessary to control her diabetes. In June 2007, Plaintiff went to the Kitchen Clinic to obtain insulin. Lab tests were performed and revealed that her glucose levels were high. Plaintiff was contacted, and she explained that she had run out of insulin. She was provided some and urged to test her blood sugar frequently. R. at 260-61. Her blood sugars were still high in July, and her diabetes was described as poorly controlled. R. at 259. Plaintiff's blood sugars were high in August, and she admitted that she had checked them only once over the

preceding two weeks. R. at 258. In September she reported "doing okay" even though her blood sugars were high. R. at 257. In October 2007 Plaintiff's blood sugars were still high; she was referred to diabetes case management and "encouraged to not run out of insulin." She denied suffering from depression and did not report any other problems. R. at 256.

Plaintiff returned to the Kitchen Clinic in January 2008. Her diabetes was described as uncontrolled even though Plaintiff reported "doing okay." R. at 255. A similar report followed her visit in February. R. at 254. In March, Plaintiff reported experiencing anxiety attacks. Her diabetes was still uncontrolled, and she was instructed to exercise daily (in part, because her weight had climbed to over 180 pounds). R. at 253. In April, Plaintiff was "counseled at length regarding diet and importance of getting blood sugar under control." R. at 252.

Plaintiff's treating physician for her diabetes was Dr. Daniel Lyons, who specializes in endocrinology. On October 16, 2008, Plaintiff saw Dr. Lyons for a routine diabetic check. She told Dr. Lyons that she had been experiencing pain in her abdomen and leg and an occasional loss of balance. Plaintiff also indicated she had not been compliant with treatment, leading Dr. Lyons to diagnose her as suffering from "Diabetes mellitus, type 1. Uncontrolled with a remarkable paucity of complications." Dr. Lyons arranged for tests and planned to provide Plaintiff the results and a "recommendation which will no doubt include significant intensification of insulin program." R. at 227-30. In a letter written to Plaintiff that same day, Dr. Lyons advised Plaintiff that her blood glucose levels were high and uncontrolled. He adjusted her medications and urged her to phone with her readings every one to two weeks. R. at 232.

In January 2009, Plaintiff told Dr. Lyons that she was not experiencing dizziness, headaches, tingling, numbness, or lack of balance. She reported experiencing pain that she rated at 6 on a scale of one to ten, but there is no indication as to where she felt pain or that the pain was limiting in any way. In fact, Dr. Lyons' notes do not address the pain at all. R. at 318-21. Plaintiff had a routine visit in early March. R. at 316. Plaintiff returned to Dr. Lyons in April after being hospitalized with diabetic ketoacidosis ("DKA"), which can occur in diabetics who have insufficient amounts of insulin. Indeed,

Plaintiff reported to Dr. Lyons that she had not been taking her insulin and that her blood glucose that morning was over 300.  Dr. Lyons described her condition as poorly controlled and "discussed importance of good control" and "[r]ecommend WEEKLY call-ins of [blood glucose] for adjustments."  R. at 312-15.  In late August Plaintiff reported a sore throat but otherwise was doing well, and denied experiencing headaches or dizziness.  She again reported having pain that rated six out of ten, and again Dr. Lyons' notes say nothing more about this pain.  Dr. Lyons noted Plaintiff was experiencing hypoglycemia at night and hyperglycemia during the day and that her condition was uncontrolled; nonetheless, he adjusted her medications.  R. at 307-11.

In September 2009 Plaintiff went to her regular doctor (Dr. Dennis Robinson) – not Dr. Lyons – and asked that he complete her disability forms.  Dr. Robinson's notes report that Plaintiff suffered from diabetic neuropathy and recite Plaintiff's complaint that "she has a lot of pain in the leg and hands," but there are no other reports from Dr. Robinson demonstrating any prior (or subsequent) treatment for this condition.  To the contrary, it appears Dr. Robinson treated this condition for the first time at this appointment, which is when he provided Plaintiff a trial of neurontin.  R. at at 380-81.

Plaintiff returned to Dr. Lyons in mid-December.  As in the past, Dr. Lyons' records reflect Plaintiff's reports about unspecified pain that was six on a 1-10 scale and the fact that she was not experiencing headaches or dizziness.  She also reported "[g]enerally feeling OK."  Dr. Lyons assessed Plaintiff as suffering from Type 1 diabetes "uncontrolled with neuropathy.  Otherwise, no apparent complications identified."  He again encouraged Plaintiff to monitor her blood sugars regularly, call with those readings weekly, and take her insulin as directed.  R. at 303-06; 383.  Plaintiff saw Dr. Lyons again in March 2010.  The records again reflect Plaintiff as suffering pain at a level of six out of ten – and once again, there is no further discussion of Plaintiff's generalized complaint.  The March 2010 record also reflects Plaintiff's complaint of headaches, but she denied having problems with balance or falling.  R. at 397-401.

During the hearing in June 2010, Plaintiff testified that Dr. Robinson diagnosed her as suffering from neuropathy, and while she could not remember when she last saw him she believed her last visit was in January 2010.  R. at 27.  She described the neuropathy as affecting her arms and legs and rendered her unable to walk or stand for

more than ten to fifteen minutes, sit comfortably for more than twenty minutes, or to grab and hold objects. If she sat longer than twenty minutes she became restless due primarily to pain and had to stand up and move. R. at 28-29. She experiences dizziness and sleepiness on a daily basis, particularly when her blood sugar is high. R. at 33. Plaintiff described the pain as a burning sensation that is made worse with walking and standing. R. at 36. For relief, she elevates her legs three to four times a day for thirty to forty-five minutes at a time. R. at 37. If she uses her hands a lot (by, for instance, folding laundry or doing the dishes), she experiences pain from her palms to her elbow and has difficulty holding on to objects. She requires breaks every fifteen to thirty minutes while doing household chores. R. at 37.

The ALJ elicited testimony from a vocational expert ("VE"). When asked to assume a person of Plaintiff's experience and age who could perform light work, the VE testified such a person could return to the job of cook as that job was performed by Plaintiff or to the jobs of order clerk or fast food worker, as those jobs were performed and as they are performed in the national economy. R. at 50-51. The second hypothetical changed the first by limiting the claimant to sedentary work; the VE testified that such an individual could return to the job of order clerk. R. at 51. The third hypothetical was the same as the second except it added a requirement that the claimant leave the work site to elevate her feet for thirty to forty-five minutes per day, three to four times per day. The VE testified such a person could not perform any work in the national economy. R. at 52. The fourth hypothetical was the same as the third, except that it removed the requirement that the opportunity for claimant to elevate her feet occur away from the work site; again, the VE testified there were no jobs that could be performed. R. at 52. The fifth and final hypothetical posed by the ALJ was the same as the second except the claimant could sit or stand for no more than fifteen minutes at a time. The VE testified such a person could not work in the national economy.

Plaintiff's counsel asked a hypothetical that was the same as the ALJ's second, except that it restricted the claimant to only occasional handling and feeling. The VE testified such a person could not work in the national economy.

The ALJ found Plaintiff's subjective complaints were unsupported by clinical and objective findings. In reaching this conclusion, the ALJ noted the inconsistencies

4

between Plaintiff's testimony and her reports to doctors, particularly Dr. Lyons. He also noted Plaintiff's failure to follow medical advice in that she did not exercise regularly, "failed to start her medications at times, failed to take her insulin as prescribed, and failed to test her blood sugars as recommended." The ALJ noted Plaintiff's bout with DKA, but also observed that the episode appeared to have been caused by her failure to take insulin and that "her symptoms quickly improved with hydration and insulin." No medical provider – not Dr. Lyons, her endocrinologist, and not Dr. Robinson, who reportedly diagnosed Plaintiff as suffering from neuropathy – suggested Plaintiff was limited or that her condition was unusual in any way (beyond any results of her failure to follow Dr. Lyons' directions). Finally, the ALJ noted Plaintiff's daily activities were inconsistent with the degree of limitations she described at the hearing. R. at 16-17. The ALJ found Plaintiff could perform the full range of light work and, based on the VE's testimony, could perform work in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

The principal issue in this case revolves around the ALJ's credibility determination. The familiar standard for analyzing a claimant's subjective testimony is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history

5

omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
>    1. The claimant's daily activities;
>    2. the duration, frequency and intensity of the pain
>    3. precipitating and aggravating factors;
>    4. dosage, effectiveness and side effects of medication;
>    5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322. While current regulations incorporate these considerations, the Eighth Circuit has declared that the "preferred practice" is to cite Polaski. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

      The ALJ considered the appropriate factors in evaluating Plaintiff's credibility. Despite complaints of debilitating pain, Plaintiff did not follow her doctors' advice. "A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility." Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005); see also Wildman v. Astrue, 596 F.3d 959, 968-69 (8th Cir. 2010). Plaintiff's reports to Dr. Lyons reflect pain of far less severity than she described during her testimony. Indeed, the mention

of pain in Dr. Lyons' reports appears to be little more than an afterthought, and Dr. Robinson mentions neuropathy just once. Plaintiff's daily activities are inconsistent with the limitations she described in her testimony. The Record as a whole contains substantial evidence supporting the ALJ's decision.

Plaintiff argues the ALJ erred in ascertaining her functional capacity without medical evidence. To the contrary, the ALJ noted the medical evidence's *absence* of any limitations – an absence that itself serves to prove that no limitations exist. Moreover, while "a claimant's RFC is a medical question, . . . in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). It is simply not true that the RFC can be proved *only* with medical evidence. Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam). Evidence of Plaintiff's actual daily activities and the medical evidence that existed was sufficient to support the ALJ's determination about Plaintiff's capabilities.

In her Reply Brief, Plaintiff for the first time contends the ALJ failed to properly develop the Record because he failed to solicit a consultative examination. "'The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.'" Halverson v. Astrue, 600 F.3d 922, 933 (8th Cir. 2010) (quoting Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994)). Here, the Record was sufficient to allow the ALJ to make a determination. The fact that it did not support the determination Plaintiff desired does not trigger the ALJ's obligation to solicit additional medical evidence.

### III. CONCLUSION

The Court concludes substantial evidence in the Record as a whole supports the Commissioner's final decision, and that decision is affirmed.

IT IS SO ORDERED.

DATE: November 26, 2012

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT

7